UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 22-cv-21452-XXXX

DAVID EFRON,

        Plaintiff,

v.

MADELEINE CANDELARIO, and
MICHELLE PIRALLO DI CRISTINA,

        Defendants.

**Jury Trial Demanded**

## COMPLAINT

Plaintiff David Efron (hereinafter "Efron") files this Complaint against Defendants Madeleine Candelario ("Candelario") and Michelle Pirallo Di Cristina ("Pirallo") for their participation in a civil rights violation and a conspiracy to deprive Efron of his Due Process Rights under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 and Florida state law. He demands a trial by jury.

## INTRODUCTION

1. This case involves a sprawling multi-year and ongoing effort by the Defendants to enrich themselves at Plaintiff Efron's expense based on court judgments procured by an illicit scheme. Defendants committed their fraud through a conspiracy that, under information and belief, was developed in Miami and then executed through the courts of Puerto Rico with the assistance of two Puerto Rican appellate court judges who are non-party conspirators in this scheme to violate Efron's civil rights.

1

2. Efron is an attorney with a national law practice as well as several inherited family businesses. He and Candelario were married in Puerto Rico in 1983. On August 26, 2002, the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, in Case No. 99-12806 Family Court Division 28, entered an Order for change of venue to Puerto Rico. (Exhibit I). The Florida Court ordered Efron to pay to Defendant Candelario $750,000 as a "lump sum provisional distribution of marital assets… without prejudice to the Former Husband to seek reimbursement at the time of the final hearing in Puerto Rico…." (Exhibit I). This order was legally valid and binding and established the maximum amount to be advanced to Candelario subject to reimbursement in favor of Efron. Efron complied with the order in its entirety, tendering the one-time lump sum provisional distribution as ordered.

3. But an extraordinary and deeply troubling series of events was about to unfold. Following her divorce from Efron, Candelario started co-habiting with Charles Cordero, then a Puerto Rico appellate court judge.

4. Because Cordero was a member of the Puerto Rican judiciary, Candelario now had a powerful conduit through which her attorney, Pirallo, could illegally manipulate the transferred property distribution proceedings and the Puerto Rican courts to enrich herself at Efron's expense.

5. Candelario, Pirallo, and Cordero joined in a scheme and conspiracy to deny Efron his civil and due process rights in the Puerto Rican courts by exerting influence over the ongoing court proceedings relating to Efron and Candelario's property distribution.

6. The purpose of the conspiracy was for Candelario and Cordero to extract from Efron much more than the $750,000 lump sum ordered by the Miami-Dade family court. And by implementing their scheme with the stroke of a judge's pen, Efron would be left powerless.

2

7. However, because Cordero could not directly interfere in the case between Efron and Candelario before the court in Puerto Rico, the scheme needed to recruit another Puerto Rican judge to manipulate the divorce proceedings to ensure that Efron would be denied due process and that Candelario could continue to enrich herself at Efron's expense by benefiting from improper and corrupt rulings.

8. Candelario, Pirallo, and Cordero found the perfect candidate in another judge sitting on the appellate court in Puerto Rico: Nestor Aponte Hernandez. Judge Nestor Aponte's brother, Jorge Aponte Hernandez ("Jorge Aponte"), was a Puerto Rican government official then facing prosecution for serious corruption charges. (Exhibit II). Judge Aponte's brother was desperate for legal machinations to facilitate his efforts to avoid justice. Legal machinations that Cordero could provide.

9. Through this conspiracy, the Defendants entered into an agreement wherein one Puerto Rico state appellate court judge, Charles Cordero, would rule in favor of the criminally indicted brother of another Puerto Rico appellate court judge, Nestor Aponte Hernandez, in exchange for Nestor Aponte giving corruptly favorable and legally suspect financial rulings for the benefit of Cordero's girlfriend, Candelario (Efron's former spouse). At all times relevant, this illegal arrangement was attended and facilitated by Pirallo and Candelario through a coordinated series of sham court filings and representations to courts.

10. And so, with the pieces falling into place, the parties' scheme was finalized. Judge Cordero would ensure that when given the chance he would rule in favor of Judge Aponte's criminally indicted brother in exchange for Judge Aponte's favorable rulings for Candelario, Cordero's girlfriend. The scheme was a classic *quid pro quo*: I save your brother and you help me and my girlfriend.

11. At all times relevant, this illegal arrangement was attended and facilitated by Candelario and her attorney Pirallo in a coordinated series of sham court filings and representations with Cordero and Aponte. Pirallo was an essential component of the scheme: her court filings opened the way to Efron's finances, while Judge Aponte would place his robe-clad foot in the door to ensure it stayed open.

**The Aponte Case**

12. In March 2004, Jorge Aponte Hernandez, Judge Aponte's brother, was the disgraced former director of Puerto Rico's Office of Management and Budget under criminal indictment. (Exhibit II). He was charged with using his office to orchestrate a self-enrichment scheme by selling a government building to a co-conspirator for $1,900,000 and using public funds to repurchase the same building months later for $8,700,000, a difference of $6,800,000 in illicit profits. In March of that year, an appellate panel (without Cordero) oversaw Jorge Aponte's appeal from a trial court's denial of a motion to dismiss the criminal indictment against him. (Exhibit III and Exhibit IV). The appellate court denied Jorge Aponte's petition for dismissal of the charges in March 2004. (Exhibit V).

13. A few months later, Jorge Aponte filed a second appeal, again from another denial of a motion to dismiss the indictment against him. However, this time the appeal was assigned to Cordero's panel. (Exhibit VI).

14. Cordero was able to hold up his end of the bargain to Judge Aponte. And although Judge Aponte's brother had previously filed and lost a petition for certiorari before a different appellate panel just six months earlier, this time the panel with Cordero found in his favor. *Id.*

15. This decision landed a crippling blow to the prosecution by making them appear inept and motivated not by a desire to seek justice, but by political reasons. This was exactly what

Jorge Aponte needed, as his defense strategy was to paint himself as the victim of a politically motivated hit job in a case that had drawn major media attention in Puerto Rico.

16. The prosecution of Jorge Aponte was ultimately unsuccessful. In furtherance of his false victim narrative, Jorge Aponte filed a lawsuit against the prosecutors claiming false prosecution. The jury in that case returned a verdict in favor of the prosecutors who had attempted to bring Jorge Aponte to justice.

## THE CANDELARIO CASE

17. Days after Jorge Aponte's certiorari appeal was decided in his favor by Cordero's panel, his girlfriend and co-inhabitant, Candelario, through her attorney Pirallo, filed a motion with the trial court in San Juan requesting a $50,000 monthly "advance" on her share of the undetermined marital assets from her former marriage to Efron. Candelario's motion came unprompted by any change in fact or law, was facially contrary to the Florida court order, and faced no legitimate prospect of success.[1] It did not matter. Candelario and Pirallo's goal was not to succeed in the trial court, but to set the stage for an appeal of the trial court's expected denial of their motion, so that the case would eventually land before Judge Aponte, the same Judge Aponte whose brother's fate hung in the balance depending on the decision of Cordero's appellate panel.

18. By information and belief, on or around the period around Summer 2004, the conspirators met in Miami, Florida where Candelario lived and the parties would be out of sight from the Puerto Rico legal and political community. The conspirators and entered into an agreement whereby Cordero would render a decision helpful to Jorge Aponte in exchange for Judge Aponte subsequently awarding Candelario the requested monthly provisional advances of

---

[1] This is precisely why the trial court originally denied this request, as Candelario had no factual or legal reason to ask for the "advances" on the marital estate to be more than **doubled** after the case was transferred to Puerto Rico.

5

property from Efron.

19. The scheme worked as planned. On January 28, 2005, in a *per curiam* opinion authored by a panel involving Cordero, the presiding appellate panel issued the favorable decision to Judge Aponte's brother, reversing the trial court order. (Exhibit VI).

20. Thereafter, *in an opinion authored by Judge Aponte himself*, the appellate panel reviewing Candelario's far-fetched demand for more money from Efron was able to complete the *quid pro quo*. (Exhibit VII). Judge Aponte was able to vacate the trial court's order denying Candelario's request. Even worse, in a drastic departure from precedent, Judge Aponte took it upon himself to dramatically increase her provisional advance, ordering Efron to now pay Candelario, the girlfriend of the judge that decided his brother Jorge Aponte's fate, the sum of $50,000 per month, applied retroactively to 2001, ultimately obliterating the Florida decree. *Id.*

21. Judge Aponte was not finished repaying the favor. On February 16, 2006, the same day that a motion by Candelario asked him to do so, Judge Aponte went even further, effectively amending his own January 31, 2006 opinion and inserting language ordering Efron to pay interest accruing retroactively to 2001. (Exhibit VIII). This same day timing cannot be reconciled with legitimate judicial conduct. The motion was not an emergency, and no opportunity was afforded to Efron to respond before the ruling. The goal of the scheme and conspiracy was achieved: denying Efron due process and access to the courts to ensure he was powerless to stop the court enforced theft.

22. The scheme was wildly successful. Judge Aponte's brother is free, pursued a lawsuit against the prosecutors who attempted to bring him to justice for his corruption, and has painted himself as the hapless victim of a political shakedown. Meanwhile, Candelario and Pirallo seized to date approximately $7 million, or nearly ten times the $750,000 maximum payment set

by the Miami-Dade divorce court, from Efron.

23.     Candelario garnished Efron's salaries, bank and brokerage house accounts, and other assets,[2] and has even sought and continues to seek his arrest for non-payment of this non-support debt. (Exhibit X). Meanwhile, Efron has spent hundreds of thousands of dollars in attorney's fees attempting to fend off the unrelenting and harassing efforts to collect the spoils of the criminal conspiracy. The scheme is, therefore, still in operation to this very day. This action is Efron's attempt to finally stop this egregious perversion of justice and to restore his constitutional rights to due process and access to the courts.

24.     By means of this lawsuit, Efron seeks that all Defendants be jointly and severally found liable to the extent of (i) the damages incurred by Efron due to Defendants' unlawful activity, including attorneys' fees and costs, (ii) attorneys' fees in bringing this lawsuit, and (iii) to the extent allowed by law, punitive damages for the Defendants' illegal and fraudulent actions.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based on the federal question arising under 42 U.S.C. §1983. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

26.     This Court has personal jurisdiction over Candelario and Pirallo pursuant to the Florida Long-Arm Statute, § 48.193(1)(a)(3), Fla. Stat., because they own real property in the State of Florida, and pursuant to Fla. Stat. § 48.193(1)(a)(2), because they have committed tortious acts within the State of Florida.

---

[2] Candelario sued Efron's securities broker in an action styled *Candelario v. UBS Puerto Rico*, Civil 2008-0133, District of Puerto Rico and obtained a $4.5 million judgment, for which UBS now seeks reimbursement from Efron in a FINRA arbitration.

27. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Southern District of Florida, Defendants transacted affairs and conducted activity that gave rise to the claim of relief in this District, and most of the parties reside in this District. 28 U.S.C. § 1391(b); 18 U.S.C. § 1965(a). Additionally, by information and belief, the scheme and conspiracy were entered into in Miami, Florida where Candelario lived and the parties would be out of sight from the Puerto Rico legal and political community. Moreover, Candelario purchased and maintained property in Miami, including real property, with the profits of the conspiracy. Because of the nature and facts of this case, this is the only venue in which Plaintiff can receive fair and impartial justice.

## THE PARTIES

28. Plaintiff David Efron is of legal age, with residence in Miami, Florida, and also domiciled in San Juan, Puerto Rico.

29. Defendant Madeleine Candelario is a property owner and resident of Miami, Florida, only. She was married to Plaintiff Efron from 1983 to early 2001.

30. Defendant Michelle Pirallo Di Cristina, by information and belief, is a property owner and resident of Puerto Rico.

31. Non-party conspirator Aponte is a resident of Puerto Rico.

32. Non-party conspirator Cordero has property in Miami and resides in Puerto Rico.

## FACTUAL ALLEGATIONS

### Origins of the Scheme

#### a. The Criminal Indictment and Appeal of Jorge Aponte Hernandez

33. In September 1997, a building located at Barbosa 306, Hato Rey, Puerto Rico

("Barbosa 306 Building") was offered for sale to the government of Puerto Rico for $3,764,000. (Exhibit IV). At the direction of Jorge Aponte Hernandez, then Puerto Rico's executive director of Office of Management and Budget, the government declined the opportunity to purchase the Barbosa 306 Building. *Id.* Jorge Aponte Hernandez is the brother of Defendant and former judge Nestor Aponte Hernandez.

34. On or about July 17, 1998, Miguel A. Cabral-Veras ("Cabral") purchased the Barbosa 306 Building for $1,900,000. *Id.* Then, less than one month later, on or about August 10, 1998, Jorge Aponte initiated an official communication advising Cabral of the government's intent to acquire the Barbosa 306 Building. On or about October 1, 1998, under Jorge Aponte's official direction, the government of Puerto Rico purchased the Barbosa 306 building from Cabral for $8,700,000 – a stunning increase of $6,800,000 over the price Cabral had paid for the building less than three months earlier. This was also $4,936,000 more than the acquisition price that Jorge Aponte had rejected just ten months earlier. *Id.* On information and belief, Jorge Aponte Hernandez's support for this blatantly corrupt transaction was procured in La Romana, Dominican Republic, where an unindicted co-conspirator had sent his private jet to Puerto Rico to transport Jorge Aponte to and from the co-conspirator's home in La Romana for offshore, off-the-record meetings.

35. This fraud was discovered and referred to the Statewide Prosecutor in Puerto Rico. On May 21, 2003, the Puerto Rico Statewide Prosecutor, whose office prosecutes government corruption, through the court, found probable cause to charge Jorge Aponte with criminal misuse of public funds and on May 30, 2003, formally indicted Jorge Aponte. (Exhibit II).

36. The brazen corruption was evidenced by the shocking price disparity in a transaction in which Jorge Aponte orchestrated a $6,800,000 profit for Cabral on a property

purchased for $1,900,000 three months earlier. Faced with this inescapable disparity, explainable only by naked corruption, Jorge Aponte moved to suppress the evidence and strike the pleadings. The trial court on October 1, 2003, denied the motion to strike the pleadings. (Exhibit III). Jorge Aponte filed an unsuccessful appeal. The Special Independent (statewide) Prosecutor on March 1, 2004, opposed a second appeal, and disclosed evidence to be presented at that trial. (Exhibit IV). The prosecution prevailed in that appeal, which was denied.

37. On October 4, 2004, Jorge Aponte filed another motion to strike elements in the criminal allegations directly in the appellate court. (Exhibit VI).

38. This appeal, which was ultimately successful, was assigned to a different panel, and coincidentally fell into the lap of co-conspirator Cordero, as the case was assigned for review to an appellate panel on which he participated. This assignment was just what the conspiracy needed: an appeal that presented a golden opportunity to put a finger on the scale of justice for the corrupt family member of a seemingly unrelated fellow appellate court judge who could then repay the favor by interfering in the ongoing litigation between Candelario and Efron. (Exhibit VI).

      b.    **Efron and Candelario's Post-Divorce Property Distribution Litigation**

39. Efron and Candelario were married from 1983 to 2001. On June 22, 1999, a divorce petition was filed with the Court of First Instance in San Juan, Puerto Rico. Divorce papers had also been filed in Miami-Dade Circuit Court. The marriage was finally dissolved on May 3, 2001 and became final on June 4, 2001. Acrimonious and complex property distribution litigation followed.

40. On May 3, 2001, the Court of First Instance ordered Efron to pay Candelario a <u>one-time</u> "monthly" provisional advance of $50,000 of short duration on her share of the marital assets until their divorce decree became final 30 days later. The court did not order Efron post-divorce to

pay spousal, alimony, or child support.[3] Following the dissolution of Efron and Candelario's marriage, Efron raised their minor children without assistance from Candelario. The provisional "monthly" advance of $50,000 ordered by the Court of First Instance related strictly to the matter of Candelario's enjoyment of marital assets in the interim period before the divorce decree was finalized and would become enforceable 30 days later. This is the usual procedure in divorces in Puerto Rico. There was no support order entered other than the Florida advance distribution order. (Exhibit I).

41. One month later, on June 4, 2001, the divorce decree became final and Efron ceased to have any obligation to continue paying the originally ordered provisional advance. (Exhibit I).

42. On August 26, 2002, the Miami-Dade Circuit Court Family Court Division entered an order relinquishing jurisdiction over the divorce proceedings to the Court of First Instance in Puerto Rico. In its order, the Miami-Dade Circuit Court ordered Efron to pay Candelario a $750,000 one-time lump sum payment in full resolution of the issue of advancement on her enjoyment of her share of the marital assets pending division of the marital assets, with which Efron duly complied. Moreover, the Miami-Dade Circuit Court's relinquishment of jurisdiction extinguished a $20,000 per month alimony obligation that Efron had been paying to Candelario since 1999. The Florida order also stated that any overpayment by Efron would be returned by Candelario. (Exhibit I).

43. On November 5, 2002, the Court of First Instance denied a motion filed by Candelario for retroactive application of the $50,000 "monthly" advancement for enjoyment of marital assets and reaffirmed that the $50,000 "monthly" advancement was in effect only from May 3, 2001, to June 4, 2001, when the divorce decree was finalized and went into effect.

---

[3] Efron has custody of the children.

44. That Puerto Rico order was affirmed on appeal, and after remand, Efron and Candelario filed briefs with the Court of First Instance. Candelario renewed her plea for the Court of First Instance to order retroactive payment of the monthly sum of $50,000 for her share in the enjoyment of marital assets from June 22, 1999, to June 4, 2001. The Court of First Instance held oral arguments on August 18, 2004, during which Candelario reiterated her position with respect to retroactivity of the $50,000 provisional payment. Efron had argued in briefing that the issue of advance enjoyment of marital assets was foreclosed by the $750,000 lump sum payment to Candelario ordered by the Miami-Dade Circuit Court in its August 26, 2002 order. (Exhibit I)

45. There was no further record activity in the case until March 7, 2005. Then, after nearly four years of litigation over whether the Court of First Instance's May 3, 2001 order should be permanently and retroactively applied to June 22, 1999, Candelario requested in a 2-page motion the monthly payment of a $50,000 "advance" on her share of the marital assets be made retroactive to June 4, 2001, with interest. That motion was denied by the trial court.

    c.    **Formation of the Scheme**

46. Following her divorce from Efron, Candelario began co-habiting with Cordero, the Puerto Rico appellate court judge who would eventually be a member of the panel presiding over the appeal in Jorge Aponte's case.

47. By information and belief, around June-July 2004, prior to Jorge Aponte Hernandez petitioning Cordero's appellate panel to hinder the prosecution against him, Candelario, Judge Cordero, and Judge Aponte convened a meeting in Miami, Florida, where Candelario lived and the parties would be out of sight from the Puerto Rico legal and political community. Also in attendance was Pirallo, Candelario's personal attorney and confidante.

48. There, those present entered into an agreement whereby Cordero and Judge Aponte

12

would engineer two extraordinary and lawless judicial machinations. First, Cordero would secure a favorable ruling in the appeal of Judge Aponte's corrupt brother and in exchange Judge Aponte would grant a massive amount of money Efron was to be paying to Candelario monthly.

49. On January 28, 2005, in a *per curiam* opinion authored by a panel including Cordero, the appellate court granted Jorge Aponte's appeal and landed a crippling blow to the prosecution's efforts to bring his corruption to justice. (Exhibit VI).

50. About a month later, on March 7, 2005, Candelario filed a motion with the Court of First Instance requesting a monthly $50,000 "advance" on her share of the marital assets retroactive to June 4, 2001, with interest. On March 28, 2005, the Court of First Instance issued a one-page order denying Candelario's motion.

51. Less than two months later, on May 20, 2005, Candelario filed an appeal that once again landed right where it needed to: on the docket of Judge Aponte. (Exhibit VII). As planned in the corrupt scheme, an appellate panel presided over by Judge Aponte was assigned to review Candelario's appeal.[4]

### d. Judge Aponte Delivers for Candelario and Cordero

52. On January 31, 2006, Judge Aponte fulfilled his end of the corrupt bargain. At his direction and in an opinion authored by Judge Aponte himself, the appellate panel reviewing the Court of First Instance's March 28, 2005 denial of Candelario's motion vacated and reversed the Court of First Instance's order and effectively obliterated the Florida decree. (Exhibit VII). Judge Aponte ballooned the previously ordered monthly payment from Efron to pay Candelario to a staggering $50,000 per month and applied that decision retroactively to June 4, 2001. *Id.*

53. But Judge Aponte was not finished. On February 16, 2006, *the same day* that a

---

[4] That review of Candelario's appeal being assigned to an appellate panel presided by Nestor Aponte Hernandez was the result of the corrupt scheme.

13

motion by Candelario asked him to do so, Judge Aponte went further. The instantaneous timing of this ruling as well as its extraordinary content resulted from the corrupt scheme. Amending his own January 31, 2006, opinion, Judge Aponte added language ordering Efron to pay interest at 10.5% accruing retroactively to June 4, 2001.[5] (Exhibit VIII)

54. Judge Aponte thus fulfilled his end of the *quid pro quo*, abusing his judicial office to enrich Candelario and Cordero. Judge Aponte's January 31 and February 16, 2006, orders remain in effect and continue to damage Efron to this day.

55. As detailed more specifically below, since Judge Aponte's orders on January 31 and February 16, 2006, the conspiracy has furthered its ongoing scheme to frustrate resolution of the property distribution case between Candelario and Efron in a deliberate effort to accumulate and garnish $50,000 per month from Efron in perpetuity.

e. **How the Scheme Continues to Defraud Efron By Continued Deprivation of his Due Process Rights**

56. Judge Aponte's 2006 orders remain in effect currently, cloaking the ongoing scheme with the armor of legal force. Since 2006 through the present day, the conspiracy has gone to extraordinary lengths to seize money from Efron based on these corruptly procured orders.

57. Candelario and Pirallo's ongoing use of the corrupt Aponte decision continues to deny Efron his due process rights, as every motion, hearing, or appearance in Court related to the divorce action is tainted by the precedential effect of that decision.

58. Candelario and Pirallo continue to use the corrupt Aponte decisions as both sword and shield in their ongoing effort to rob Efron. With no ability to overturn the decision, Efron is continuously dragged before the Courts of Florida and Puerto Rico where Candelario and Pirallo

---

[5] Candelario requested that remedy in a motion to the Appellate Court that same day, February 16, 2006, and the Appellate Court (Judge Aponte) on that same day amended the judgment in a lengthy opinion.

can use the decision to force legal outcomes that would otherwise be impossible.

59. After paying some $400,000 to Candelario based on the illegitimate Puerto Rico court orders, Efron was unable to make further payments. Candelario attached Efron's assets, including all bank and brokerage accounts, in 2007-2009. Those attachments continue to this day. This includes $371,052 in Efron's assets held with UBS Group AG, $586,000 with Santander Bank, and various corporate stocks. Candelario used the illegitimate court orders to garnish Efron's law firm salary. To date, the scheme succeeded in collecting approximately $7 million from Efron pursuant to Judge Aponte's tainted 2006 orders. Upon information and belief, Candelario purchased and maintains real and other property in Miami-Dade County with these ill-gotten gains.

60. Defendant Candelario also used the corruptly procured court orders to illegally attach Efron's assets at UBS, Santander Securities, Banco Popular, and other entities.

61. Upon information and belief, at least some of the assets seized by Candelario under the authority of the corruptly procured court orders have been paid by Candelario to Cordero for his role in this corrupt scheme.

62. The use of the Aponte decision by Candelario and Pirallo to deny Efron his due process rights continues to this day. As recently as August 23, 2021, Candelario attempted to execute in Florida the corrupt judgment resulting from the conspiracy. (Exhibit IX).

63. Defendant Candelario has intentionally delayed the property distribution case between Candelario and Efron for over twenty (20) years to keep the so called "advance payments" flowing her way. Candelario has sought seemingly endless continuances, continuously sought recusal of judges, and engaged in a deliberate scheme to delay in the courts of Puerto Rico. The delays are intentional, as each delay causes more months to drag on, and each month's passing results in an additional $50,000 payment to be due as an "advance."

64. At the time of their divorce, Efron and Candelario's marital estate was valued by experts at the time of the divorce at under $2 million, half of which belonged to Efron, meaning the conspiracy has managed to enrich Candelario and Cordero with over **$6 million** in excess of any legally permissible entitlements, gained through Judge Aponte's deprivation of Efron's due process rights.

65. The conspirators also embarked on an effort to illegally deny Efron not only his property, but his very freedom. On September 10 and 21, 2021, Candelario, in furtherance of the activities, purpose, and scheme of the conspiracy, filed a motion requesting Efron to be held in custody for contempt. (Exhibit X).

66. Until Efron's due process rights are restored by the abrogation of the Aponte decision, Candelario and Pirallo will continue to have free reign to use the corrupt orders in that case to enlist the courts of Florida and Puerto Rico as unwitting co-conspirators in their illegal scheme.

### COUNT I – DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER 42 USC § 1983
### Against all Defendants

67. Plaintiff Efron incorporates by reference and realleges paragraphs 1 through 66 as if fully set forth herein.

68. Efron is protected by the United States Constitution against having his property, income, and various investments seized by court order without due process.

69. Among those due process rights is the right to be heard in an impartial forum before a neutral tribunal.

70. Candelario and Pirallo, by recruiting Judge Aponte to issue a corrupt decision on behalf of Candelario in exchange for Cordero's decision aiding Judge Aponte's brother, denied Efron his right to have the property distribution case heard before a neutral tribunal.

71. Aponte, acting under the color of Puerto Rican law, issued the corrupt decision based, not upon a fair and honest application of the law, but on his desire to repay Cordero.

72. That decision, due to its legal force, allowed Candelario and Pirallo to continue to deny Efron his due process rights in the various court proceedings that have occurred thereafter.

73. Candelario and Pirallo used the Aponte decision to induce the courts of Florida and Puerto Rico to issue orders that deprived Efron of his property without due process and have begun an attempt to have a court issue an order that deprives Efron of his liberty.

74. As a direct and proximate consequence of the Defendants' actions, Efron has been injured in his business and property, causing Efron to suffer monetary damages in an amount not less than $7,000,000, said damages to be proven at the time of trial.

75. **WHEREFORE**, Plaintiff David Efron demands judgment in his favor and against Madeleine Candelario ("Candelario") and Michelle Pirallo Di Cristina.

### COUNT II – CONSPIRACY TO DENY CIVIL RIGHTS UNDER 42 USC § 1983
### Against All Defendants

76. Plaintiff Efron incorporates by reference and realleges paragraphs 1 through 66 as if full set forth herein.

77. This is an action for damages under 42 USC § 1983 brought against Candelario and Pirallo for their participation in a conspiracy, together with Aponte and Cordero, in which they reached an agreement with Cordero and Judge Aponte, acting under the color of state law, to deny Efron his constitutional rights protected by the Due Process Clause of the Fourteenth Amendment to be heard in an impartial forum and to have equal and fair access to the courts.

78. Candelario and Pirallo, along with conspirators Judges Aponte and Cordero, reached an agreement through which Candelario and Pirallo would file motions demanding money from Efron in the pending divorce action while Cordero and Judge Aponte would trade judicial

favors to ensure that the motions were granted.

79. Candelario, Pirallo, and Cordero's reason for engaging in the conspiracy was simple: to enrich themselves from Efron's payments.

80. Judge Aponte's goal was to ensure that, in exchange for his corrupt rulings that would ensure that Candelario, Pirallo, and Cordero could continue to benefit from Efron's payments, Cordero would hinder the prosecution of his criminally indicted brother.

81. Although each had their own part to play, each conspirator had the same objective: to deny Efron his due process rights so that he could be wrongfully ordered to pay Candelario a never-ending stream of monthly advance payments from their divorce action.

82. As a result, Efron is still to this day being denied his due process rights to fair and equal access to the Courts and to have his divorce case heard before a neutral tribunal. Instead, Efron must litigate under the shadow of an illegally obtained ruling from Judge Aponte.

83. As a direct and proximate consequence of the Defendants' conspiracy and the overt acts taken in furtherance of that conspiracy, Efron has been injured in his business and property, causing Efron to suffer monetary damages in an amount not less than $7,000,000, said damages to be proven at the time of trial.

84. **WHEREFORE**, Plaintiff David Efron demands judgment in his favor and against Madeleine Candelario ("Candelario") and Michelle Pirallo Di Cristina.

## COUNT III – CIVIL CONSPIRACY
### Against All Defendants

85. Plaintiff Efron incorporates by reference and realleges paragraphs 1 through 66 as if fully set forth herein.

86. In 2004 and onward, the Defendants and their judicial conspirators agreed to commit a series of unlawful overt acts in pursuance of a conspiracy to damage Efron. The

conspirators agreed to the *quid pro quo* between former judges Cordero and Aponte, whereby Cordero would thwart the criminal prosecution of Aponte's brother in exchange for Aponte granting Candelario, Cordero's girlfriend and co-habitant, a startling and unprecedented increase in her monthly provisional advance from $20,000 to $50,000, retroactive to five years and with interest.

87. As alleged in this complaint, the scheme continues to the present day through Candelario's relentless pursuit of Efron in the courts of Florida and Puerto Rico for money ostensibly owed to Candelario based on Judge Aponte's corruptly procured rulings

88. As a direct and proximate consequence of the Defendants' conspiracy and the overt acts taken in furtherance of that conspiracy, Efron has been injured in his business and property, causing Efron to suffer monetary damages in an amount not less than $7,000,000, said damages to be proven at the time of trial.

89. **WHEREFORE**, Plaintiff David Efron demands judgment in his favor and against Madeleine Candelario ("Candelario") and Michelle Pirallo Di Cristina.

## COUNT IV – UNJUST ENRICHMENT
### Against All Defendants

90. Plaintiff Efron incorporates by reference and realleges paragraphs 1 through 66 as if fully set forth herein.

91. Because of the acts set forth above, Candelario and Cordero were paid money to which they are not entitled and have been unjustly enriched at the expense of Efron.

92. In equity and good conscience, Candelario and Cordero should not be permitted to retain monies wrongfully received from Efron.

93. Efron is entitled to return of the money received by Candelario and Cordero.

94.     **WHEREFORE**, Plaintiff David Efron demands judgment in his favor and against Madeleine Candelario ("Candelario") and Michelle Pirallo Di Cristina.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Efron demands that judgment be entered in his favor against the Defendants, as follows:

On Counts I, II, III, and IV the amount of Plaintiff David Efron's actual damages, reasonable attorney's fees, and costs of this civil action, and such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff David Efron demands trial by jury of all issues so triable.

Dated: May 10th, 2022.

Respectfully submitted,

By: */s/Kendall Coffey*
**Kendall Coffey**
Florida Bar No. 259861
**COFFEY BURLINGTON, P.L.**
2601 South Bayshore Drive
Penthouse One
Miami, Florida 33133
Tel: 305-858-2900
kcoffey@coffeyburlington.com
lmaltz@coffeyburlington.com
service@coffeyburlington.com

By: */s/ Benedict P. Kuehne*
**Benedict P. Kuehne**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
Miami Tower, Suite 3105
100 S.E. 2 Street
Miami, Florida 33131-2154
Tel: 305-789-5989
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com